# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

KEVIN H.C.,[1]

                Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

Case No. 3:20-cv-00239-SLG

## DECISION AND ORDER

On or about October 6, 2017, Kevin H.C. ("Plaintiff") protectively filed an application for disability insurance benefits ("SSDI") under Title II of the Social Security Act ("the Act"),[2] alleging disability beginning August 28, 2015.[3] Plaintiff has exhausted his administrative remedies and filed a Complaint seeking relief from this Court.[4] Plaintiff's

---

[1] Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Plaintiff brought claims under Title II. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI). For convenience, the Court cites the regulations governing disability determinations under both titles.

[3] Administrative Record ("A.R.") 22. The record appears to contain only the application summary, not the application itself. The application summary lists October 10, 2017 as the application date. A.R. 299.

[4] Docket 1 (Plaintiff's Compl.).

opening brief asks the Court to vacate and remand the agency's decision for further administrative proceedings.[5]  The Commissioner filed an Answer and a brief in opposition to Plaintiff's opening brief.[6]  Plaintiff filed a reply brief on June 4, 2021.[7]  Oral argument was not requested and was not necessary to the Court's decision.  On July 20, 2021, Defendant Commissioner Saul was substituted by Acting Commissioner Kilolo Kijakazi pursuant to Federal Rule of Civil Procedure 25(d).[8]  This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[9]  For the reasons set forth below, Plaintiff's request for relief is granted.

## I.    STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[10]  "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[11]  Such evidence must be "more than a mere scintilla," but may be "less than

---

[5] Docket 24 (Plaintiff's Br.).

[6] Docket 22 (Answer); Docket 25 (Defendant's Br.).

[7] Docket 27 (Reply).

[8] Docket Annotation (July 20, 2021).

[9] 42 U.S.C. § 405(g).

[10] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[11] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)).

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 2 of 25

a preponderance."[12]   In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[13]   If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[14]   A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which he did not rely."[15]   An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[16]   Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[17]   In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect his own interests.[18]

---

[12] *Richardson*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[13] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[14] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[15] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[16] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[17] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[18] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

## II.    DETERMINING DISABILITY

The Social Security Act ("the Act") provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[19]  In addition, Supplemental Security Income ("SSI") may be available to individuals who do not have insured status under the Act but who are age 65 or older, blind, or disabled.[20]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[21]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[22]

---

[19] 42 U.S.C. § 423(a).

[20] 42 U.S.C. § 1381a.

[21] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[22] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[23] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[24] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[25] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[26] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."[27] *The ALJ determined that Plaintiff had not engaged in substantial activity since the alleged onset date of August 28, 2015.[28]*

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the

---

[23] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[24] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[25] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[26] *Tackett*, 180 F.3d at 1101.

[27] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[28] A.R. 24.

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 5 of 25

twelve-month duration requirement.[29]  *The ALJ determined that Plaintiff had the following medically determinable severe impairment: s/p cerebrovascular accident (CVA).  The ALJ also determined that Plaintiff's hypertension, diabetes, hyperlipidemia, and obesity were non-severe impairments.[30]*

**Step 3.**  Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.[31]  *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.[32]*

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[33] *The ALJ determined that Plaintiff had the residual functional capacity to perform light work*

---

[29] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[30] A.R. 25.

[31] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[32] A.R. 25.

[33] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

*except he could frequently push/pull with the right upper extremity and occasionally push/pull with the left upper extremity; frequently balance; occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl; and frequently reach, handle, finger, and feel with the non-dominant left upper extremity. The ALJ determined that Plaintiff could not climb ladders, ropes, or scaffolding; must avoid moderate exposure to non-weather related extreme cold and extreme heat, wetness, humidity, noise, and vibration; and must avoid all exposure to unprotected heights and moving/hazardous machinery.[34]*

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do his past relevant work, the claimant is deemed not to be disabled.[35] Otherwise, the evaluation process moves to the fifth and final step. *The ALJ determined that Plaintiff was capable of performing his past relevant work as a dentist and a health care facility administrator.[36]*

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of the

---

[34] A.R. 25–26.

[35] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[36] A.R. 33.

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 7 of 25

RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.[37]  *The ALJ did not reach Step Five in his analysis.*[38]

The ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act at any time from August 28, 2015, the alleged onset date, through January 29, 2020, the date of the ALJ's decision.[39]

### III.    PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff was born in 1959 and was 55 years old on the alleged onset date.[40]  From July 1988 through February 2013, Plaintiff was the owner/operator of a dental practice.[41]  In April 2013, Plaintiff suffered a hemorrhagic stroke.[42]  From February to May 2013, Plaintiff worked at South Central Foundation as a dentist and from July 2014 to August 2015, as a dentist at Anchorage Neighborhood Health Center.[43]  On December 28, 2018, the Social Security Administration ("SSA") determined that Plaintiff was not disabled

---

[37] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[38] A.R. 34.

[39] A.R. 34.  The Court notes that the date of the ALJ's decision on January 29, 2020 predates the date last insured of December 31, 2020.  A.R. 24.

[40] A.R. 187, 299.

[41] At Plaintiff's hearing before the ALJ, the vocational expert classified Plaintiff's past work as a solo practitioner dentist under two categories of work.  The vocational expert opined Plaintiff worked as a dentist, DOT #072.101-010, and as a health care facility administrator, DOT # 187.117-010.  A.R. 175–76.  The ALJ determined at Step Four that Plaintiff was capable of performing his past work both as a dentist and as a health care facility administrator.  A.R. 33.

[42] A.R. 53–84, 468, 537.

[43] A.R. 372–83.

under the applicable rules.[44]  Plaintiff appeared and testified with representation at a hearing held on December 20, 2019 in Anchorage, Alaska before ALJ Paul Hebda.[45]  On January 29, 2020, the ALJ issued an unfavorable ruling.[46]  On July 24, 2020, the Appeals Council denied Plaintiff's request for review.[47]  On September 25, 2020, Plaintiff appealed the Commissioner's final decision to this Court.[48]

## IV.    DISCUSSION

Plaintiff is represented by counsel in this appeal.  In his opening brief, Plaintiff alleges that the ALJ erred in his evaluation of the medical opinions of Richard Blake, PA-C, and Danelle Winn, Ph.D., resulting in an improperly formulated RFC.  He also asserts the ALJ erred in concluding that Plaintiff could perform his past relevant work as a dentist.[49]  The Commissioner argues that "[s]ubstantial evidence, including the uncontested adverse symptom testimony finding and the opinions of Dr. Dhiman, Dr. Kiehl, and Dr. Anderson, supports the ALJ's decision that Plaintiff was not disabled."[50]

---

[44] A.R. 200.

[45] A.R. 147–50, 161–73.

[46] A.R. 19–34.

[47] A.R. 1–5.

[48] Docket 1.

[49] Docket 24 at 13–24.

[50] Docket 25 at 4–12.

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 9 of 25

A.  <u>Weighing of Medical Opinions</u>

Plaintiff applied for Title II benefits on or about October 6, 2017, so the new regulations apply to his claim.[51]  Under the new regulations, the definition of what constitutes a medical opinion has narrowed, focusing on what the claimant can do despite his impairments and what work-related limitations are present.[52]  The new regulations define a medical opinion as follows:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities:
>
> (i)     Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii)    Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii)   Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> Your ability to adapt to environmental conditions, such as temperature or fumes.[53]

---

[51] A.R. 22.

[52] *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1513(a)(2).

[53] 20 C.F.R. § 404.1513(a)(2).

The new regulations provide that the ALJ no longer gives any particular weight to a medical opinion based on its source, thereby eliminating the treating source rule.[54] Instead, the ALJ considers the persuasiveness of a medical opinion based on five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including length, extent, and type of treatment; (4) specialization; and (5) other relevant factors that support or contradict the medical opinion.[55] Supportability and consistency are considered the most important factors for evaluating persuasiveness.[56] Supportability and consistency are explained as follows in the regulations:

(1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.[57]

Generally, these are the only two factors the ALJ is required to address in his decision.[58] However, when two or more medical opinions or prior administrative medical findings

---

[54] *Revisions to Rules Regarding the Evaluation of Medical Evidence,* 82 Fed. Reg. 5844, 5867–68 (Jan. 18, 2017) (codified at 20 C.F.R. pts. 404, 416), 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (for claims filed on or after March 27, 2017).

[55] 20 C.F.R. § 404.1520c(c).

[56] The regulations state, "The factors of supportability . . . and consistency . . . are the most important factors [the SSA] consider[s] when [the SSA] determine[s] how persuasive [the SSA] find[s] a medical source's medical opinions or prior administrative medical findings to be." 20 C.F.R. § 404.1520c(b)(2) (for claims filed on or after March 27, 2017).

[57] 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2).

[58] 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) ("[W]e will explain how we considered the

"about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ must explain how "the other most persuasive factors" were considered.[59]

1. *Richard Blake, PA-C*

PA Blake was Plaintiff's treating provider from at least January 2014 through 2019. In June 2017, PA Blake opined that Plaintiff could never work on a full-time basis, use his hands for fine or gross manipulation, or raise his arms over his shoulders. He also opined that Plaintiff had moderate pain that would cause him to be off task for 30% of the workday. PA Blake noted that his "responses [in Plaintiff's attorneys' medical source statement form were] subjective — Functional Capacity Exam [was] not performed."[60]

The ALJ determined that PA Blake's June 2017 medical opinion was not persuasive. The ALJ reasoned that PA Blake "did not support the opinion with objective evidence, stating that his responses [were] subjective and that he did not perform a functional capacity exam." Specifically, the ALJ pointed out that PA Blake's treatment notes did not support the degree of limitation opined by PA Blake "as they generally indicate[d] [Plaintiff]'s neurological examinations were within normal limits."[61] The ALJ specifically cited the treatment record from January 2018 in which Plaintiff reported to PA

---

supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision.").

[59] 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3) (for claims filed on or after March 27, 2017).

[60] A.R. 428–29.

[61] A.R. 32.

Blake that he was "at 95% of where he was after the first stroke."[62]  The ALJ also noted

that Dr. Downs's examination of Plaintiff in October 2018 showed that although Plaintiff

"complained about right sided weakness, loss of sensation, and coordination," Dr. Downs

indicated that Plaintiff's complaints were not borne out by his examination.[63]

Plaintiff asserts that the ALJ failed to properly evaluate PA Blake's opinion.  He

argues that the "ALJ should have found PA-C Blake's opinion very persuasive because it

is well supported by his findings and consistent with other findings on the record."[64]  The

Commissioner disagrees, arguing that substantial evidence supports the ALJ's

assessment of PA Blake's opinion under the new medical opinion regulations.[65]

The Court's review of the record reveals that PA Blake's treatment notes indicate

Plaintiff had normal neurological examinations after his 2013 stroke through the date of

PA Blake's June 2017 opinion.[66]  Plaintiff saw PA Blake on January 10, 2014 for follow up

after an emergency room visit on April 6, 2013 for dizziness and nausea, which was later

diagnosed as a hemorrhagic stroke.[67]  At the January 2014 appointment, PA Blake

---

[62] A.R. 33, 433–34.

[63] A.R. 33, 497.

[64] Docket 24 at 16.

[65] Docket 25 at 6–9.

[66] *E.g.,* A.R. 436–37, 440, 443, 445–46, 449, 452, 455, 469, 473, 477.

[67] A.R. 53–84, 468, 537.  The record of the CT scan on April 6, 2013 shows the CT of the head was considered normal.  A.R. 80.  However, in a later record by Jeffrey Sponsler, M.D., at the Alaska Brain Center, LLC, Dr. Sponsler reported viewing an MRI image on Plaintiff's phone from April 8, 2013, "clearly showing large infarct."  A.R. 537.

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 13 of 25

assessed Plaintiff with a "personal history of transient ischemic attack [TIA], and cerebral infarction without residual deficits." Plaintiff had 5/5 strength in the upper and lower extremities and a "subtle slight weakness with pedal pulls," with a normal gait and normal neurologic examination.[68] At appointments after August 28, 2015, PA Blake observed 5/5 strength in the upper and lower extremities, a normal gait, and normal neurological examinations.[69] In July 2016, PA Blake noted that Plaintiff had a history of CVA with "minimal residual effects" and that Plaintiff reported that he had been "just taking a 325mg aspirin daily."[70] However, in the same timeframe, despite normal neurological examinations, Plaintiff reported having some residual effects from the 2013 stroke, including tingling and shooting pains on his right side as well as significant fatigue throughout the day.[71]

The record after PA Blake's June 2017 opinion contains some evidence of a second stroke. Specifically, at a follow up visit with PA Blake in January 2018, Plaintiff reported that he thought he may have experienced another small stroke while on vacation in June 2017. However, Plaintiff reported that he thought he was "probably 95% back to where he was after that first stroke [in 2013]." At the same time, PA Blake observed that "there still are some issues . . . notable in [Plaintiff's] speech and word finding."[72] PA

---

[68] A.R. 469.

[69] *E.g.,* A.R. 442–46, 448–49.

[70] A.R. 443.

[71] A.R. 436, 440.

[72] A.R. 433–34.

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 14 of 25

Blake continued to consider Plaintiff's neurological examinations normal, but also noted, "as far as his speech there is a very slight stutter which is similar to what I remember. I do not appreciate any worsening of any of his previous symptoms."[73]

On January 10, 2019, Plaintiff presented to the emergency department at Mat-Su Regional Medical Center with lightheadedness, vertigo, and slurred speech.[74] On the same date, Plaintiff underwent a CT brain scan. The CT showed a "[l]eft cerebellar stroke, nonacute, but new since the 2013 exam. No hemorrhagic component is evident." The carotid doppler ultrasound showed bilateral intracranial carotid calcifications and no flow apparent in the left vertebral artery.[75] On January 18, 2019, Plaintiff saw Jeffrey Sponsler, M.D., for follow up after MRI brain testing. Dr. Sponsler performed a full neurological examination and concluded it was a normal examination. He observed clear speech with no slurring. Dr. Sponsler reviewed the MRI taken on January 11, 2019 and noted a "chronic infarction in the left side of the cerebellum, in the distribution of the left posterior inferior cerebellar artery" and "mild-to-moderate supratentorial chronic white matter microvascular ischemic changes." He also noted "[m]ild sensory deficits [in the] right arm and right leg."[76] On January 24, 2019, Plaintiff followed up with PA Blake. He reported doing well with no significant problems. Plaintiff's neurological examination was normal.[77]

---

[73] A.R. 431, 434.

[74] A.R. 549.

[75] A.R. 560–61.

[76] A.R. 532–42.

[77] A.R. 520–23. PA Blake noted that imaging taken on January 10, 2019, showed "the old area of infarction but nothing new." A.R. 520. However, in the Court's medical record, the report for

In August 2019, Plaintiff reported to PA Blake that he was "deal[ing] with dizziness on a chronic basis" and that he continued to work on a part-time basis, but that "there are days when he literally cannot do the job and will postpose some of [his dental] patients . . ."[78]

As noted above, PA Blake opined that Plaintiff would not be able to use his hands for gross or fine manipulation or raise his arms above his shoulders on a full-time basis.[79] Such limitations would clearly affect Plaintiff's ability to perform his past work as a dentist. The Dictionary of Occupational Titles ("DOT")'s dentist position (DOT #072.101-010) requires frequent fingering, handling, and reaching.[80] The job of dentist also requires a high degree of aptitude ability (highest 1/3) for motor coordination and manual dexterity and an extremely high aptitude ability (top 10%) for finger dexterity.[81] The health care facility administrator position (DOT #187.117-010) requires occasional reaching, handling, and fingering.[82]

Yet, the ALJ did not address the supportability or consistency of PA Blake's opinions that Plaintiff could not raise his arms above his shoulders and could not use his hands for fine or gross manipulation on a full-time basis. The ALJ's conclusion that

---

the imaging taken on January 10, 2019 states, "[t]here is tissue loss on the left cerebellum, new since the previous exam."  A.R. 561.

[78] A.R. 44.

[79] A.R. 428.

[80] Docket 24 at 19.  *See also* DICOT #072.101-010,

[81] DICOT #072.101-010, 1991 WL 646699.

[82] DICOT #187.117-010, 1991 WL 671346.

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 16 of 25

Plaintiff's normal neurological examinations undercut the degree of limitations opined by PA Blake does not address PA Blake's opinions on the limitations to Plaintiff's arms and hands. Moreover, the Court's review of the record shows that Plaintiff reported right sided numbness and pain and left shoulder pain at follow up visits with PA Blake.[83] Additionally, after PA Blake's June 2017 opinion, there was evidence of an MRI of Plaintiff's left shoulder showing a near circumferential labral tear and fairly large inferior osteophytes at the AC joint.[84] In October 2018, Stanford Downs, M.D., noted that Plaintiff's fine motor manipulation was "extremely slow and deliberate on the right but with no dyspraxia" and that Plaintiff's left side manipulation was "a little bit slow and deliberate but not to the same degree and again no dyspraxia."[85] At an emergency room visit in January 2019, Plaintiff reported "chronic unchanged right sided deficits at baseline secondary to prior stroke."[86]

The Commissioner points out that the ALJ's RFC determination is more closely aligned with the testimony of medical expert Nitin Dhiman, M.D., that Plaintiff had no manipulation restrictions on the right and was limited to frequent gross and fine manipulation on the left, and the Court notes that Plaintiff does not challenge this aspect of the ALJ's decision.[87] But Dr. Dhiman also testified, upon questioning by Plaintiff's

---

[83] A.R. 436 (residual tingling and shooting pains on his right side), 430 (left shoulder pain).

[84] A.R. 525–26.

[85] A.R. 496.

[86] A.R. 549.

[87] Docket 25 at 7; A.R. 152–54.

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 17 of 25

attorney, that Plaintiff "could have suffered from clumsy hand syndrome, where he had a clumsy hand dysarthria. So, basically, [a] claimant such as [this] would have trouble speaking and they would have problems grabbing things and so on and so forth. So, it's definitely possible [INAUDIBLE], affect the non-affected hand."[88]

In sum, the ALJ did not adequately address the supportability or consistency of PA Blake's opinions regarding Plaintiff's ability to perform fine and gross manipulation or lift his arms above the shoulder. This error is not harmless because Plaintiff's previous work as a dentist requires frequent fingering, handling, and reaching and a high degree of aptitude ability for motor coordination and manual dexterity, as well as an extremely high aptitude ability for finger dexterity.[89] His past work as an owner/operator of a dental practice, classified by the vocational expert as a health care facility administrator, requires occasional fingering, handling, and reaching.[90] As a result of the ALJ's error, the RFC may not include all of Plaintiff's limitations and may preclude Plaintiff from performing his past work.

### 2. *Danelle Winn, Ph.D.*

On December 4, 2018, Plaintiff saw Danelle Winn, Ph.D., for a diagnostic examination. Dr. Winn observed that Plaintiff was alert with clear and goal-directed thought processes and his speech was clear, but he had a labored, somewhat broken,

---

[88] A.R. 156.

[89] DICOT #07.101-010, 1991 WL 646699.

[90] DICOT #187.117-010, 1991 WL 671346.

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 18 of 25

rate of speech. Plaintiff's mental status examination was normal, and his overall intellectual functioning fell within the average range.[91] Based on a personal interview, psychological testing, and a mental status examination, Dr. Winn opined,

> "While [Plaintiff] does view himself as cognitively capable of engaging work as a dentist when he is not feeling a great degree of physical fatigue but worries about his level of attention and organization of his thinking when he is tired (which has been more frequent over the past two years) and I agree with his assessment in that regard, he certainly is cognitively capable of understanding, remembering and carrying out simple directions of a degree of difficulty that would be required of repetitive work activities as well as of managing his financial affairs in his own best interest."[92]

The ALJ determined that this opinion was not persuasive "because it [was] vague and [did] not address [Plaintiff's] ability to perform a range of work, including complex work in any kind of detail." The ALJ also determined that Dr. Winn's opinion about the effect of fatigue was "not supported by her testing or examination" because her evaluation showed that Plaintiff had a full-scale IQ of 106 with good memory, recall, concentration, calculations, fund of information, abstractions, and insight and that the testing did not "reflect any aspect of cognitive functioning that was even in the low average range and thus the degree of any deterioration [was] not sufficient enough to be consistent with a diagnosis of even a mild vascular dementia." The ALJ noted that the "record is consistent with a lack of cognitive decline, which would not preclude the claimant's ability to perform even complex work."[93]

---

[91] A.R. 506–14.

[92] A.R. 513.

[93] A.R. 33.

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 19 of 25

Plaintiff asserts that the ALJ improperly discounted Dr. Winn's opinion on fatigue for "vagueness" without attempting to contact her for clarification. Plaintiff cites *Lockhart v. Comm'r of Soc. Sec.,* a district court case from the Eastern District of California, for the proposition that the ALJ should have attempted to clarify the record by recontacting Dr. Winn regarding her fatigue opinion. In *Lockhart,* the ALJ had indicated that the plaintiff's physician's use of the word "deficient" to describe the plaintiff's concentration ability was vague. Therefore, the district court determined that the ALJ acknowledged that the medical opinion was ambiguous.[94] And, in the Ninth Circuit, "[a]mbiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'"[95] Accordingly, the district court in *Lockhart* remanded to allow further development of the record.[96]

Citing *Ford v. Saul,* a recent Ninth Circuit case, the Commissioner contends that ALJs are not required to base the RFC on vague opinions.[97] In *Ford,* the Ninth Circuit determined that because the ALJ had years of medical records and multiple medical opinions to inform her decision, the duty to develop the record regarding the meaning of "fair" and "limited" in one examining physician's opinion was not triggered.[98] Like *Ford,* the record in this case contains years of medical evidence with numerous reports of

---

[94] *Lockhart v. Comm'r of Soc. Sec.,* 2015 WL 517049, at *9 (E.D. Cal. Sept. 3, 2015).

[95] *Tonapetyan v. Halter,* 242 F. 3d 1144, 1150 (9th Cir. 2001) (internal citations omitted).

[96] *Lockhart,* 2015 WL 517049, at *9.

[97] Docket 25 at 10 (*citing Ford v. Saul,* 950 F.3d 1141, 1156 (9th Cir. 2020)).

[98] *Ford,* 950 F.3d at 1156.

fatigue by Plaintiff in the record.[99]  Therefore, the ALJ had ample medical records to inform his decision and was not required to recontact Dr. Winn regarding what the ALJ perceived to be her "vague" opinion.

Plaintiff also alleges that the ALJ "failed to properly evaluate the opinion of Dr. Winn concerning the effects of Plaintiff's fatigue."[100]  The Commissioner responds that the ALJ properly addressed the supportability and consistency of Dr. Winn's opinion and that substantial evidence supports the ALJ's assessment under the new medical opinion regulations.[101]  While the ALJ's analysis of Dr. Winn's opinion adequately addresses the portion of Dr. Winn's assessment regarding Plaintiff's cognitive capabilities, it does not address the effect of fatigue.[102]  Plaintiff's testimony and the medical record show that Plaintiff reported fatigue as a recurring symptom after his stroke in 2013.  For example, at the hearing, Plaintiff testified that even though he slept seven to eight hours at night on average, beginning after his first stroke, he took naps regularly during the day due to fatigue.[103]  Plaintiff also testified that he believed that he was "let go" from his last job due to his medical conditions.  Specifically, he indicated that he was only able to treat about

---

[99] *See infra.,* n. 105.

[100] Docket 24 at 20–21.

[101] Docket 25 at 10–12.

[102] *Garrison v. Colvin,* 759 F.3d 995, 1012–13 (9th Cir. 2014) ("[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion.").

[103] A.R. 169–70.

10 patients a day instead of the 20 patients he was expected to treat at the clinic where he last practiced as a dentist.[104]   Plaintiff also reported sleep interruption and fatigue symptoms to his medical providers during the relevant period.[105]

In sum, although the ALJ did not have a duty to recontact Dr. Winn regarding her purportedly "vague" opinion, the ALJ did not adequately address the supportability and consistency of Dr. Winn's opinion regarding Plaintiff's fatigue.  The Court will remand on this issue.

3. *The RFC and Step Four of the Sequential Analysis*

The RFC for Plaintiff includes frequent pushing and pulling with the right upper extremity and occasional pushing and pulling with the left extremity.  It also includes frequent reaching, handling, fingering, and feeling with the non-dominant left upper extremity and no limitation with the right upper extremity.  The RFC does not contain any limitations due to fatigue.[106]

Plaintiff asserts that the "ALJ's failure to properly evaluate" PA Blake's and Dr. Winn's opinions resulted in an incomplete RFC and improper determination at Step Four

---

[104] A.R. 162–63.

[105] A.R. 355 (daily activities include "sometimes a 3-4 hour nap"), 436 (residual effects from the CVA, including significant fatigue throughout the day), 439–40 (fatigues fairly easily and although Plaintiff was working part-time, he reported his fatigue would make it "very difficult" for him to complete a 40-hour work week), 452 (might be a little tired but he thinks it's appropriate for his age), 471 (sleep interruptions), 495 (fatigues faster), 507 ("views himself as being more easily fatigued and forgetful intermittently over the past several years, which he attributes to a cerebral vascular accident in 2013 and possibly a second several years later"), 508 (on days he is feeling more fatigued, he will avoid driving), 531 (often feels tired, fatigued, or sleeping during daytime).

[106] A.R. 25–26.

that Plaintiff was capable of returning to his past work as a dentist.[107]   He also alleges

that "by ignoring the effects of Plaintiff's fatigue on his ability to perform [ ] work-related

tasks," the ALJ did not consider all of Plaintiff's impairments.[108]   The Commissioner does

not specifically address Plaintiff's assertions regarding the RFC or the allegation that the

ALJ erred at Step Four.[109]

As set forth above, because the ALJ did not adequately address the supportability

and consistency of PA Blake's opinion regarding Plaintiff's gross and fine manipulation

and upper extremities limitations or Dr. Winn's opinion regarding Plaintiff's fatigue, the

RFC may not include all of Plaintiff's limitations.   Additionally, based on the ALJ's first

hypothetical,[110] the vocational expert opined that Plaintiff could perform as a dentist and

as a health care facility administrator.[111]   Given the possibility that the ALJ would have

formulated a different RFC for Plaintiff and provided different hypotheticals to the

---

[107] Docket 24 at 13–24.

[108] Docket 24 at 24.

[109] Docket 25 at 4–12.

[110] The ALJ's first hypothetical was as follows:

And let's start with the following hypothetical, where I have an individual of the claimant's [ ] age[,] education, past work, experience.  Would be able to perform light level work as defined by the Social Security Administration, but with the following limitations.  Pushing and pulling with the upper extremities would be frequent on the right, occasional on the left.  Frequent balancing.  Occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling.  No climbing of ladders, ropes or scaffolding.  Reaching, handling, fingering, feeling, could all be at the frequent level on the left upper extremity.  We would have the avoidance of moderate exposure to non-weather related extreme cold, extreme heat, wetness, humidity, noise, and vibration.  And we would have the avoidance of all exposures to moving hazardous machinery and unprotected heights.  A.R. 176.

[111] A.R. 177.

vocational expert, the ALJ's errors were not harmless and require remand for further proceedings. Because the ALJ's failure to properly address PA Blake's and Dr. Winn's opinions could also impact the ALJ's findings at Step Four, the Court does not address Plaintiff's argument that substantial evidence does not support the ALJ's determination that Plaintiff could perform work as a dentist and health care facility administrator.

C. Scope of Remand

Plaintiff asks the Court to vacate the final agency decision and remand for further administrative proceedings.[112] The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[113] In this case, the proper remedy is reversal and remand for further administrative proceedings and the issuance of a new decision with appropriate findings at each step of the sequential evaluation.

On remand, the ALJ shall discuss the supportability and consistency of PA Blake's manipulation and upper extremity limitations and Dr. Winn's opinion regarding the effects of fatigue under the new regulations. The ALJ will reevaluate the RFC, reassess Step Four, and proceed to Step Five as necessary.

---

[112] Docket 24 at 24.

[113] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

Case No. 3:20-cv-00239-SLG
Decision and Order
Page 24 of 25

## V.   ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error.  Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 24 is GRANTED; the Commissioner's motion at Docket 25 is DENIED; and this matter is REMANDED for further proceedings consistent with this order.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 18th day of January, 2022 at Anchorage, Alaska.

*/s/ Sharon L. Gleason*

UNITED STATES DISTRICT JUDGE